## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**MARIBEL MALDONADO-CÁTALA**,

    Plaintiff,

    v.                               Civil No. 13-1561 (BJM)

**MUNICIPALITY OF NARANJITO**, *et al.*,

    Defendants.

### OPINION AND ORDER

Maribel Maldonado-Cátala ("Maldonado") brings this suit against the Municipality of Naranjito, Orlando Ortiz-Chevres, Marialis Figueroa-Negrón, José Figueroa-Nieves, Hiram Bristol-Colon, José Tomás Rodríguez-Veléz, and Insurance Company ABC (collectively "the Municipality"), alleging hostile work environment and retaliation in violation of Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.* Docket No. 1. Maldonado also alleges violations of various Puerto Rico laws.[1] The parties consented to magistrate judge jurisdiction. Docket No. 51. The Municipality moved for summary judgment, Docket Nos. 58, 118, and Maldonado opposed, Docket Nos. 104–05.

For the reasons set forth below, the Municipality's motion is **GRANTED IN PART AND DENIED IN PART**.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in

---

[1] Puerto Rico Law 100, P.R. LAWS ANN. tit. 29, § 146 *et seq.*; Puerto Rico Law 69, *id.* § 1321 *et seq.*; Puerto Rico Law 17, *id.* § 155 *et seq.*; Puerto Rico Law 115, *id.* § 194(a) *et seq.*; P.R. Bill of Rights; P.R. Const. art. II, § 1; P.R. Civ. Code art. 1802, P.R. LAWS ANN. tit. 31, § 5141; P.R. Civ. Code art. 1803, P.R. LAWS ANN. tit. 31, § 5142.

favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When the moving party lacks the burden of proof at trial, it may discharge this threshold responsibility in two ways: by producing evidence negating an essential element of the nonmoving party's claim, *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000), or showing "there is an absence of evidence to support the nonmoving party's case," *Celotex*, 477 U.S. at 325. *See* Fed. R. Civ. P. 56(c)(1)(B). Once that bar is cleared, "the burden shifts to the summary judgment target to demonstrate that a trialworthy issue exists," *Plumley v. S. Container, Inc.*, 303 F.3d 364, 368 (1st Cir. 2002), by "affirmatively point[ing] to specific facts" in the record revealing the presence of a meaningful dispute, *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and may not rest upon "conclusory allegations,

improbable inferences, and unsupported speculation," *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

## BACKGROUND

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56 submissions.[2] I note that both sides raise frivolous objections, and attempt to insert irrelevant facts and legal argumentation into their statements. This summary omits these glosses on the record, but any genuine disputes of material fact are addressed in this opinion's discussion section. [3]

### The Parties

Maldonado held a career position with the Municipality, and began working for

---

[2] Defendants' statement of uncontested facts ("DSUF"), Docket No. 63; plaintiff's opposing statement of material facts ("OSMF"), Docket No. 104; and defendants' reply statement of material facts ("RSMF"), Docket No. 117.

[3] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). The court may deem the movant's facts uncontested if they are not properly controverted in compliance with the rule, and litigants ignore it "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

Maldonado failed to comply fully with the local rule. In her opposing statement, she repeatedly inserted additional facts, purportedly by way of qualifying or denying the Municipality's assertions. Facts that do not directly qualify or refute those proffered by the movant must be submitted in a separate section. *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 32 (1st Cir. 2010) (citing D.P.R. Civ. R. 56(c)). By instead presenting her additional facts either alongside or instead of legitimate qualifications or denials, Maldonado has attempted to "improperly shift the burden of organizing the evidence presented . . . to the district court." *Mariani-Colón*, 511 F.3d at 219. As a result, I have disregarded all facts in her opposing statement that do not constitute qualifications or denials. *Acevedo-Parilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 137 (1st Cir. 2012) (where "[plaintiff] submitted an opposing statement . . . but included additional information as to each opposed fact that did not specifically correlate to [defendant's] proposed facts," it was "an appropriate exercise of [court's] discretion" to "disregard any additional facts provided by [plaintiff] when denying or qualifying [defendant's] statement.").

its Emergency Management Office ("EMO") in August 2008 as an emergency medical technician ("EMT"), where she provided medical services to injured persons and transported them to the hospital. DSUF ¶¶ 1, 2, 12. To perform her essential duties, she needed a license to drive an ambulance, a driver's license, and an EMT license that itself required a CPR license and sign-language certification. DSUF ¶¶ 3, 4.

Ortiz-Chevres became the Municipality's mayor in January 2009. DSUF ¶ 8. He appointed Figueroa-Negrón ("Figueroa") that same month to the Municipality's director of human resources position, where she remained until July 2012. DSUF ¶ 9. The mayor also appointed several EMO directors while Maldonado worked for the EMO: José Padilla, who served throughout 2009; Hiram Bristol-Colon ("Bristol"), who served from January to October 2010; Rámon Vázquez Baez, who served from November 2010 to January 2011; and Tomás Rodríguez-Vélez ("Rodríguez-Vélez"), who served from 2011 onward. DSUF ¶ 11. With the assistance of the EMO subdirector, the EMO director is responsible for supervising employees, handling personnel matters, and assigning work schedules. DSUF ¶¶ 12–15. All other EMO employees are not supervisors. DSUF ¶ 13.

***Alleged Harassment and Retaliation***

In July 2010, Maldonado suffered a work-related accident. DSUF ¶ 34. As a result, the State Insurance Fund ordered her to stop working. DSUF ¶ 34. She remained on unpaid leave, which the mayor approved, from July 8, 2010 to April 3, 2012. DSUF ¶¶ 35, 36. On September 30, 2010, she accompanied a coworker to complain to Figueroa about harassment by Bristol. DSUF ¶¶ 37, 61. While there, Maldonado told Figueroa about comments made by Bristol and Jose Figueroa-Nieves ("Figueroa-Nieves"). Maldonado Dep. 20:23–25, 24:21–24. She alleges that around 2009 and 2010, Figueroa-Nieves and another coworker, Maria Elena Serrano ("Serrano"), called her "machito" (translated in the record as "manly") on a daily basis. Maldonado Dep. 11:19–20. Figueroa-Nieves also allegedly told her that she liked "butterflies in her mouth and

perhaps that was because [she] ha[dn't] had a men [sic] to really put the wood to [her] and changed [sic] [her] opinion." Maldonado Dep. 13:13–19.

Maldonado claims this "joke" "referring to [her] sexual orientation" was made "all the time" and "two or three times" in front of Bristol.[4] Maldonado Dep. 13:18–25. Maldonado also said Bristol once told her that he would flirt with her if he did not know she was lesbian. DSUF ¶ 92. Figueroa assured Maldonado and her coworker that the complaint would be investigated, and relayed it to the mayor. DSUF ¶ 37.

By October 2010, the Municipality hired an attorney to investigate the complaint. DSUF ¶ 62. The attorney interviewed several employees and informed them that they should report any retaliation against them if it occurred. DSUF ¶¶ 71–72, 76. Maldonado was one of the employees interviewed, and told the investigating attorney that sexual harassment was occurring in the workplace against other females. DSUF ¶¶ 74, 98. But in doing so, she did not mention any harassment by Bristol or Figueroa-Nieves against her in particular. DSUF ¶ 79. In his investigation, which included asking other employees about harassment against Maldonado, the attorney did not uncover any incidents of harassment against her. DSUF ¶¶ 86, 96. On October 28, the attorney drafted a report finding that Bristol engaged in misconduct and sexual harassment against female employees. DSUF ¶ 94. The attorney recommended that the mayor remove Bristol from his position. DSUF ¶ 104. The mayor requested Bristol's resignation the next day, Bristol tendered it, and the mayor immediately accepted it. DSUF ¶¶ 105–06.

Following that investigation, and while on unpaid leave, Maldonado received several messages on Facebook. DSUF ¶ 119. The message she received on November 1, 2010, at 9:46 p.m., called her a "nasty lesbian," "whore," "snake," and "dike." It also said "I will see you fall you dirty lesbian and every one of you one by one what you did to that man the one from emergency management . . . remember that you have children that by

---

[4] Figueroa-Nieves denies making any of these comments to Maldonado. DSUF ¶ 157. There is a genuine dispute as to whether he ever made harassing comments.

the way the boy is gay and the girl is a lesbo." Docket No. 115-3 at 13. Maldonado interpreted this message as a threat and filed a police report, which the police began investigating. The Municipality does not dispute that this message insulted and threatened Maldonado and her family. DSUF ¶ 119. The police traced this Facebook message to a computer in an office in the EMO. OSMF ¶ 31. That office is kept locked, and the office is generally restricted to the EMO Director and his secretary, both of whom have the keys to that office. OSMF ¶ 67.

A second message said, "I was not the one who got my wings plucked it was done to you little lesbian your back doesn't hurt no more so come back from the fund." Docket No. 115-3 at 115. A third message narrated a story in which Maldonado alleges she was referred to as the "paramedic wolf." Docket No. 115-3 at 16–17. And a fourth message called her a "lesbian" and "worthless shit." Docket No. 115-3 at 11. Because whoever sent these messages used pseudonyms, Maldonado does not know the identity of the sender or senders. DSUF ¶¶ 133–34. Maldonado speculates the sender of the November 1 message was Figueroa-Nieves. DSUF ¶¶ 128–32. She believes so because she saw his work-assigned vehicle in the EMO's parking lot after receiving the November 1 message. DSUF ¶ 161. It is undisputed that the vehicle remains in the parking lot when Figueroa-Nieves completes his shift. DSUF ¶ 161. And Maldonado admitted in her deposition that she did not know whether Figueroa-Nieves was actually at the EMO office where the computer was located on November 1. Docket No. 83 at 42:20–23. She also admits that he left at 3:00 p.m. on November 1 and did not return to the EMO until the following day, as indicated on his timecard. DSUF ¶ 164; OSMF ¶ 164 at 25.

In November 2010, Maldonado told Figueroa about the messages she had received at that point. DSUF ¶ 119. Figueroa asked Maldonado to keep her updated on the result of the police investigation so the Municipality could determine how to proceed. DSUF ¶ 119. The police did not identify the sender of the message and did not resolve the investigation. DSUF ¶ 176. In December 2011, the mayor met with Maldonado to

discuss the messages, as Figueroa was on maternity leave from October 2011 to January 2012. DSUF ¶¶ 120, 122. He asked her to submit the documents the police provided to Figueroa when she returned from maternity leave. Maldonado Dep. 46:1–4. Maldonado does not identify other specific incidents of harassment after this point and maintained a "cordial professional relation[ship]" with Figueroa-Nieves when she returned from unpaid leave. DSUF ¶ 169.

In early April 2012, Maldonado went to Figueroa's office to inform her that she was returning to work while continuing medical treatment, as determined by the State Insurance Fund. DSUF ¶ 233. During that meeting, she also met the new EMO director, Rodríguez-Veléz, whom she informed that her EMT license had expired. DSUF ¶ 235. Because the license is necessary to perform essential EMT duties, Rodríguez-Veléz suggested that Maldonado perform ambulance maintenance duties. DSUF ¶ 237. All employees at the EMO cleaned the office after each shift, but there is a genuine dispute as to whether Rodríguez-Veléz expressly said or implied that Maldonado would be required to perform janitorial duties. DSUF ¶¶ 237–38; OSMF ¶ 34.

On April 3, 2012, Figueroa sent Maldonado a letter stating that she could not work as an EMT without a valid EMT license and that she had two months to renew it.[5] DSUF ¶ 239. The next day, Maldonado returned to work as an EMT. DSUF ¶ 240. Rodríguez-Veléz subsequently informed Maldonado that she was missing an EMT license, a CPR certification, and a sign-language certification. DSUF ¶ 243. She responded that she did not have money to pay the cost of renewing the various licenses. DSUF ¶ 243. He suggested she request extra time to obtain them. DSUF ¶ 243. The Municipality alleges that because she lacked the necessary qualifications, she was reassigned to the EMO call center, where she primarily responded to emergency calls. DSUF ¶ 245. She received a "very good" performance review at the call center and did not indicate any dissatisfaction with working in that position. DSUF ¶¶ 245, 248.

---

[5] The Municipality states without dispute from Maldonado that under Puerto Rico law an EMT license is necessary to perform the job's essential duties. DSUF ¶¶ 239, 244.

On June 19, 2012, Maldonado obtained a provisional license to drive ambulances. DSUF ¶ 257. Thereafter, Rodríguez-Veléz authorized her to drive ambulances and work at the call center. DSUF ¶ 257. Maldonado alleges the Municipality reimbursed employees for the costs of obtaining the necessary licenses and that she was denied such reimbursement. She admits this alleged reimbursement occurred before July 8, 2010, and acknowledged that when she returned to work in April 2012, any request for reimbursement had to be submitted directly to the EMO director and the human resources office. DSUF ¶ 263. She submitted neither request and admitted that she lacked personal knowledge of any reimbursement to other employees. DSUF ¶¶ 260–64.

On November 14, 2012, Maldonado suffered another work-related accident, and the State Insurance Fund again ordered her to stop working. DSUF ¶ 285. Maldonado continued to receive periodic messages informing her that she lacked the licenses necessary to work as an EMT. DSUF ¶¶ 277–79. She remained on unpaid leave until November 23, 2013, when the mayor informed her that she was being terminated because the Municipality had reserved her job for more than a year in compliance with state law.[6] DSUF ¶¶ 290–91. Maldonado was informed of her right to appeal that decision, but did not do so. DSUF ¶¶ 291–92.

***Municipality's Sexual Harassment Policy and the EEOC Charge***

The Municipality has a sexual harassment policy that establishes procedures for making harassment and retaliation complaints. DSUF ¶¶ 19, 20. It requires that employees immediately report complaints. DSUF ¶ 22. EMO employees can complain to the EMO Director or the human resources director about any coworker, and to the human resources director when the complaint concerns an EMO supervisor. DSUF ¶ 18. Other than the complaint in September 2010, Maldonado did not file a formal complaint with the human resources department about Figueroa-Nieves or other employees. DSUF ¶ 127. On May 24, 2012, Maldonado filed an EEOC charge against the Municipality. DSUF ¶ 296.

---

[6] Maldonado admits state law requires the Municipality to reserve her job for only one year. DSUF ¶ 294.

In that charge, she claimed sex-based discrimination and retaliation, and alleged that: (1) harassment began against her and other employees after they participated in the investigation against Bristol in October 2010; (2) she was "coerced" to return to work after her work-related accident in July 2010; (3) the Municipality discriminated against her gender because it reimbursed the cost of obtaining the necessary licenses for males, allowed males to work without a license, and allowed employees to smear her image as a woman using the Municipality's office equipment; and (4) Figueroa-Nieves called her "manly" and said other "other epithets of homo phobic [sic] character." Docket No. 109-5 at 4, 6.

## DISCUSSION

The Municipality moved for summary judgment on Maldonado's Title VII claims alleging hostile work environment and retaliation.[7]

### I.    Timeliness of Maldonado's Claims

A Title VII plaintiff must file an administrative charge with the EEOC within either 180 or 300 days after the "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). Puerto Rico is a deferral jurisdiction, and so an employee must file the administrative charge within 300 days of the alleged unlawful conduct if she first files a charge with the Commonwealth of Puerto Rico Department of Labor; otherwise, the charge must be filed within 180 days. *Frederique-Alexandre v. Dep't of Nat. & Envtl. Res. P.R.*, 478 F.3d 433, 437 (1st Cir. 2007).

---

[7] Maldonado's complaint also claimed a violation of Title VII arising from "disparate treatment" on the basis of sex. Compl. ¶ 64. I note that both parties sporadically refer to "disparate treatment" in their briefs without fully developing an argument for or against that theory. But because the Municipality has moved for summary judgment on all of Maldonado's Title VII claims, and Maldonado only develops an argument for her hostile work environment and retaliation claims, this opinion is limited to discussing those bases for relief. *Muniz-Cabrero v. Ruiz*, 23 F.3d 607, 609 (1st Cir. 1994) ("A party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal.").

The Municipality first contends the incidents Maldonado alleges, particularly those from 2009 and 2010, are "discrete acts" that occurred on particular days and are time-barred. Defs.' Mot. Summ. J. 14. But discrete acts and hostile work environment claims are "different in kind." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). The Supreme Court has held "that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.* at 117. The Court held so "because such a claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Id.*

Maldonado filed her EEOC charge on May 24, 2012, and the parties agree she did not first file a charge with the Commonwealth of Puerto Rico Department of Labor. Accordingly, the limitations period is 180 days and extends to incidents as far back as November 26, 2011. Because the harassment from Figueroa-Nieves, Serrano, and the Facebook messages occurred in 2009 and 2010, she must establish that a discriminatory "anchoring act" occurred within the limitations period. *Noviello v. City of Bos.*, 398 F.3d 76, 86 (1st Cir. 2005). To qualify as an anchoring act, the discriminatory act must "substantially relate[ ] to [the] earlier incidents of abuse." *Id.*

Maldonado argues that her hostile work environment and retaliation claims are timely because the incidents that gave rise to each claim are intertwined and related.[8] Pl.'s Opp'n 17. The First Circuit has held that "courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct." *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001). The First Circuit

---

[8] Maldonado cites First Circuit cases concerning systemic and serial violations to argue her claims are timely. Pl.'s Opp'n 16. But in light of *Morgan*, "it is no longer necessary . . . to determine whether a violation is systemic or serial when determining a hostile work environment claim." *Crowley v. L.L. Bean*, 303 F.3d 387, 406 (1st Cir. 2002).

reasoned that "[s]uch an approach defies the *Meritor* Court's directive to consider the totality of circumstances in each case and 'rob[s] the incidents of their cumulative effect.'" *Id.* Moreover, "where the evidence can reasonably be viewed as demonstrating either discriminatory animus or retaliatory animus, a court may consider the same evidence in assessing the sufficiency of both of the plaintiff's claims." *Peréz-Cordero v. Walmart P.R., Inc.*, 665 F.3d 19, 32 (1st Cir. 2011) (court noted "overlap between [employee's] discrimination claim, which depends on proof that the hostile work environment was 'because of sex,' and his retaliation claim, which seeks to characterize the same hostile work environment as caused by his protected activity.").

The incidents that form Maldonado's hostile work environment are not time-barred because the 2010 incidents described below are "sufficiently related" to at least one incident in 2012. *See Noviello*, 398 F.3d at 86. Maldonado alleges that she was being subjected to gender-based harassment in 2010, and that the harassment escalated after she participated in the sexual harassment investigation against Bristol. The escalated harassment first manifested itself in November 2010, when she received a threatening Facebook message that was sent from an office in the EMO that was kept locked.[9] OSMF ¶ 57, 67. Because the EMO Director had the key to the locked office, and the office was generally restricted to the Director and his secretary, a reasonable jury could infer that the EMO director permitted one of the Municipality's employees to send the message. OSMF ¶ 67. Maldonado then adds that the harassment continued in 2012 when Rodríguez-Veléz, the EMO supervisor, told her she would perform janitorial duties rather than EMT duties, allegedly because she lacked the necessary EMT licenses. DSUF ¶ 237; OSMF ¶ 34. After he made this statement, Maldonado was not allowed to work as an EMT and was transferred to the EMO call center. As discussed below, there is a genuine dispute of material fact as to whether the Municipality prohibited Maldonado from working as an

---

[9] Other than in 2010, Maldonado does not allege there were other incidents of the Municipality's employees using office equipment to harass her.

EMT while allowing her male coworkers to work as EMTs without the necessary licenses.

The incidents in 2012 (i.e., Maldonado not being allowed to work as an EMT and Rodríguez-Velez's contemporaneous antagonistic statement about requiring Maldonado to perform janitorial duties) serve as the anchoring acts for Maldonado's sex- and retaliation-based hostile work environment claims because there is a common theme of retaliatory animus running through the threatening Facebook message in 2010—which referenced her participation in the investigation against Bristol—and Rodríguez-Veléz's antagonistic statement toward Maldonado in 2012. *O'Rourke*, 235 F.3d at 730 (courts should not disaggregate hostile work environment claims, as "statute of limitations problems must be understood in the context of substantive law"). In a case presenting a similar sequence of events, the First Circuit affirmed a hostile work environment claim where there was "proof that within a few weeks of filing a [disability] harassment complaint," retaliatory animus led the harassment to intensify and expand to include, among other things, threats and screaming at the employee by his supervisors. *Quiles-Quiles v. Henderson*, 439 F.3d 1, 8–9 (1st Cir. 2006). Thus, the Municipality's attempt to disaggregate the various incidents of alleged harassment would deprive them of "their cumulative effect." *O'Rourke*, 235 F.3d at 730.

The Municipality also argues Maldonado's retaliation claim is time-barred. The First Circuit has held that "retaliation claims are preserved so long as the retaliation is reasonably related to and grows out of the discrimination complained of to the agency." *Clockedile v. N.H. Dep't of Corr.*, 245 F.3d 1, 6 (1st Cir. 2001). Accordingly, this court held that a retaliatory discharge allegation was timely where the employee filed retaliation charges for discriminatory conduct with the EEOC, the EEOC issued a right to sue letter, the employee was subsequently terminated, and the judicial complaint included the termination not raised in the EEOC charge. *Muñoz-Rivera v. Walgreens Co.*, 428 F. Supp. 2d 11, 22 (D.P.R. 2006). As discussed above, the incidents that were included in

her EEOC charge, which Maldonado alleges also have a retaliatory motive, are timely. There is no dispute that the alleged retaliatory termination was not included in her EEOC charge. As in *Muñoz-Rivera*, where the court considered an alleged retaliatory termination that occurred after the employee filed the EEOC charge, Maldonado's alleged retaliatory termination is not time-barred. 428 F. Supp. 2d at 22.

## II.   Hostile Work Environment

Maldonado argues she was initially subjected to a gender-based hostile work environment, and that in response to her participation in the sexual harassment complaint against Bristol, she began to experience a retaliation- and gender-based hostile work environment. When a plaintiff raises hostile work environment claims based on gender and retaliation, "separate analysis is necessary" even where "both of [the employee's] claims arise from a single series of events." *Jensen v. Potter*, 435 F.3d 444, 454 (3d Cir. 2006)(Alito, J.), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). And where, as here, "the evidence can reasonably be viewed as demonstrating either discriminatory animus or retaliatory animus," courts can consider the "same evidence" in evaluating the sufficiency of both claims. *Peréz-Cordero*, 656 F.3d at 32 (court considered the same evidence to review sex- and retaliation-based hostile work environment claims); *see also Morales–Vallellanes v. Potter*, 605 F.3d 27, 37–40 (1st Cir. 2010). Accordingly, I review separately each of the bases for Maldonado's hostile work environment claims.

### A.   Sex-Based Hostile Work Environment

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1); *Billings v. Town of Grafton*, 515 F.3d 39, 47 (1st Cir. 2008) ("Title VII's ban on employment practices extends to sex-based discrimination that creates a hostile or abusive work environment."). To establish a hostile work environment claim, the plaintiff must show that: (1) she is a member of a

protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon sex; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) the sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) some basis for employer liability has been established. *O'Rourke*, 235 F.3d at 728.

The Municipality argues harassment based on Maldonado's perceived sexual orientation is not actionable and that she is unable to show severe or pervasive harassment that altered a term or condition of her employment. Defs.' Mot. Summ. J. 14–19. Maldonado argues she endured a hostile work environment because: (1) she was harassed by Figueroa-Nieves, Serrano, and the Facebook messages, and (2) the Municipality treated her unequally to male coworkers by requiring her to renew her licenses to work as an EMT, imposing an unreasonable time to do so, and denying her financial assistance given to male coworkers. Pl.'s Opp'n 17–18, 22.

### 1.      Based Upon Sex

The Municipality argues that sexual-orientation-based harassment is not prohibited by Title VII. The First Circuit held so in *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999). This court also found at the motion to dismiss stage that Maldonado's complaint did not state a claim for relief under a theory of sex stereotyping. Docket No. 25 at 7 n.2; *see Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989). Because Maldonado does not allege sex stereotyping in her opposition, I do not consider her hostile work environment claim on this basis. *Muniz-Cabrero*, 23 F.3d at 609 ("A party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered."). Concededly, many of the acts of harassment were directed at Maldonado's perceived sexual orientation rather than her gender. However, she also alleges that the Municipality created

a hostile work environment by treating her unequally to male coworkers, which is actionable under Title VII. *O'Rourke*, 235 F.3d at 730. In addition, she was called a "whore" in the November 2010 Facebook message, implicating her gender. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010) (words and conduct that are sufficiently gender-specific, such as "whore," "bitch," and "cunt," may state a claim of a hostile work environment"). And finally, Bristol once told her that he would flirt with her if he did not know she was lesbian, again implicating her gender. DSUF ¶ 92. *Peréz-Cordero*, 656 F.3d at 28 ("the victim's sex is inextricably linked to the harasser's decision to harass" where there is an attempt to establish a romantic relationship) (quoting *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 229 (1st Cir. 2007)).

### 2.      Severe and Pervasive Harassment

The Supreme Court has held that a Title VII claim of harassment must be sufficiently "severe or pervasive" to affect a "term or condition of employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Courts consider the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). "[S]imple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, jokes, and occasional teasing." *Id.* at 788.

The Municipality first contends Maldonado is precluded from arguing she suffered an abusive work environment due to incidents that occurred outside the

workplace. Defs.' Mot. Summ J. 14–15. Maldonado responds that "her absence from the workplace did not make her any less subject [to] attack" from harassing messages. Pl.'s Opp'n 18. The parties do not cite supporting authority for their arguments. In *Crowley*, the First Circuit held that "[c]ourts . . . permit evidence of non-workplace conduct to help determine the severity and pervasiveness of the hostility in the workplace as well as to establish that the conduct was motivated by gender." 303 F.3d at 409; *see also O'Rourke*, 235 F.3d at 724 (court affirmed verdict in favor of sexual harassment victim who offered evidence that she had received crank phone calls at home). Accordingly, Maldonado is not precluded from relying on the Facebook messages she received solely because they occurred outside the workplace.

The Municipality next argues that the Facebook messages Maldonado received amounted to simple teasing and offhand comments. The most problematic of these messages is the November 1 message, which referenced her participation in the sexual harassment investigation against Bristol, stated "I will see you fall," called her a "whore," noted her mother's frail health, and insulted her children.[10] Maldonado understandably interpreted this message as a threat and reported it to the police.[11] "[T]he presence of physical threats undeniably strengthens a hostile work environment claim." *Noviello*, 398 F.3d at 94 (quoting *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 298 n.6 (2005)). The other messages Maldonado received, including the message pressuring her to come back to work from unpaid leave, though less serious, added to the harassment.

---

[10] Maldonado speculates that the sender of this message was Figueroa-Nieves because she claims to have seen his work-assigned vehicle parked at the EMO after she received the message. At the same time, she admits that Figueroa-Nieves left the EMO at 3:00 p.m. on that day and did not return to the EMO until the following day, as indicated on his timecard. DSUF ¶ 164. Even if the sender of the November 1 message was not Figueroa-Nieves, the Municipality admitted that the message was sent from an office in the EMO that is kept locked and is only accessible to employees with a key. OSMF ¶¶ 31, 57, 67. Because reasonable inferences must be drawn in Maldonado's favor, a reasonable jury could find that one of the Municipality's employees sent the message.

[11] In the Municipality's undisputed statement of facts or elsewhere, it does not dispute that this message threatened Maldonado. DSUF ¶ 119.

Maldonado-Cátala v. Municipality of Naranjito, et al., Civil No. 13-1561 (BJM)                    17

Maldonado also argues she suffered harassment because of the various comments and jokes that coworkers made before she went on unpaid leave in July 2010. However, because she claims these comments were based on her "sexual preference" and does not argue that sex stereotyping was at all implicated, the comments lack probative value to her gender-based discrimination claim. Pl.'s Opp'n at 14. In *Higgins*, the First Circuit affirmed summary judgment in favor of the employer where the employee erroneously claimed that sexual-orientation-based harassment was prohibited by Title VII, "did not mention gender stereotyping before" the trial court, and "did not present any considered argumentation along that line." 194 F.3d at 261.

Maldonado next contends the Municipality treated male coworkers preferentially in various ways. *See O'Rourke*, 235 F.3d at 730. She first alleges the Municipality was unwilling to reimburse her for the cost of obtaining the licenses that are necessary to work as an EMT. However, she admitted that this alleged reimbursement occurred before July 2010, and that when she returned to work in April 2012, any request for reimbursement had to be submitted directly to the EMO director and the human resources office. DSUF ¶ 263. Because she did not submit a request for reimbursement and does not have personal knowledge of anyone being reimbursed, her allegation is unsupported by the evidence in the record. DSUF ¶¶ 260–64. Second, she alleges the Municipality gave her only two months to renew her licenses. The record evidence again does not support her assertion. The evidence in the record indicates that the Municipality gave her more than two months to renew her licenses, as it sent her several reminders from 2012 until her termination. DSUF ¶¶ 277–79.

Third, she alleges the Municipality allowed male coworkers to work as EMTs without the necessary licenses, but did not allow her to do the same.[12] Maldonado Dep. 34:8–37:4. Prior to not allowing Maldonado to work as an EMT, there is a genuine dispute of fact as to whether Rodríguez-Veléz expressly said or implied that Maldonado would be required to perform janitorial duties in his office. DSUF ¶ 237;OSMF ¶ 34. In

---

[12] Maldonado admits she lacked the licenses necessary to work as an EMT. DSUF ¶ 236.

*O'Rourke*, the First Circuit emphasized that unequal treatment can contribute to a hostile work environment, just like other "incidents of nonsexual conduct—such as work sabotage, exclusion, denial of support, and humiliation—can in context contribute to a hostile work environment." 235 F.3d at 730. The female firefighter in *O'Rourke* was treated unequally when her employer (1) required her to wear the outer jacket of a firefighter uniform, but did not require male firefighters to do the same; (2) blamed only her for an incident during a fire call; (3) did not assign her a locker, allegedly because the locker assignments were based on seniority; and (4) excluded her from meetings that male firefighters attended. *Id.* at 719–20, 724.

*O'Rourke* reasoned that unequal treatment is actionable in a hostile work environment claim because employers would otherwise "lack the incentive to correct behavior that, like more overtly sexual forms of harassment, works against integrating women into the workforce." *Id.* at 730 & 730 n.5 ("isolating nonsexual conduct from hostile work environment claim 'weakens the plaintiff's case and distorts the law's understanding of the hostile work environment by obscuring a full view of the culture and conditions of the workplace' and 'drain[s] harassment law of its ability to address the full range of gender-based hostility at work'") (quoting Vicki Schultz, *Reconceptualizing Sexual Harassment*, 107 Yale L.J. 1683, 1719–20 (1998)); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1114–15 (9th Cir. 2004) (employee established hostile work environment where, among other things, employer unequally applied work rules relating to overtime pay); *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001) (court noted that it has "found workplace situations discriminatory under a hostile work environment theory where the conduct at issue, though lacking any sexual component or any reference to the victim's sex, could, in context, reasonably be interpreted as having been taken on the basis of plaintiff's sex"); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) ("*Any* unequal treatment of an employee . . . may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII.").

Maldonado testified during her deposition that several of her male coworkers[13] who worked as EMTs told her that they lacked the necessary licenses.[14] The Municipality maintains that male employees were allowed to work as EMTs because they all had the necessary licenses, resulting in a genuine dispute of material fact as to whether the Municipality treated Maldonado unequally because of her gender.[15] OSMF ¶ 39. The Municipality also impliedly argues that Maldonado could not have been treated unequally because "all EMT's worker [sic] had valid licenses including a female." RSMF ¶ 42 at 19. But even if this statement is true, it would not defeat her claim. *McCoy v. Macon Water Auth.*, 966 F. Supp. 1209, 1216 (M.D. Ga. 1997) ("A sexual harassment plaintiff need not show that every member of his or her sex was subject to the harassment.").

A reasonable jury could find that this alleged unequal treatment was "severe" because Maldonado was prevented from working as an EMT and was required to work in a completely different position at the EMO call center. *Meritor*, 477 U.S. at 67. Additionally, because the alleged unequal treatment occurred since she returned from unpaid leave in April 2012 until she suffered her second work-related accident in November 2012, a reasonable jury could find the alleged seven-month period of unequal treatment sufficiently "pervasive." *Id.* And although the Municipality asserts that Maldonado did not indicate at the time that she was dissatisfied with working as a dispatcher in the call center, a reasonable jury could nonetheless find a hostile work environment because a "plaintiff may be 'unable to appreciate that he is being discriminated against until he has lived through a series of acts, [which may not have appeared to be discriminatory], and is thereby able to perceive

---

[13] These male coworkers included Alex Bou, Ariel Cátala, David Colón, Alex Cruz, and Ricardo Ebert. Maldonado Dep. 34:8–37:4.

[14] The Municipality contends these statements are inadmissible hearsay. RSMF ¶ 42 at 19. They are not because Maldonado alleges the Municipality's employees made these statements while they were still employed by it, and the statements concern a matter within the scope of that employment. Fed. R. Evid. 801(d)(2)(D).

[15] The Municipality cites the factual findings in the EEOC report to support its contention that all male employees had the necessary licenses. RSMF ¶ 42. But even if the EEOC report is trustworthy and qualifies as a hearsay exception, that finding only reaffirms the genuine dispute of fact. Fed. R. Evid. 803(8).

the overall discriminatory pattern." *O'Rourke*, 235 F.3d at 732 (quoting *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.3d 396, 402 (1st Cir. 1990)). Finally, in determining the cumulative effect of the incidents Maldonado endured, a reasonable jury could also consider the threatening and harassing Facebook messages she received and Rodríguez-Velez's alleged antagonistic statement. At the summary judgment stage, the court's "function is to determine whether, on particular facts, a reasonable jury could reach . . . a conclusion [in favor of the nonmoving party]." *Rivera–Rodriguez v. Frito Lay Snacks Caribbean,* 265 F.3d 15, 24 (1st Cir. 2001). Because there are genuine disputes of fact within Maldonado's hostile work environment claim, and the Municipality has cited no authority indicating those genuine disputes are immaterial as a matter of law, a reasonable jury could find that Maldonado was subjected to a sex- and retaliation-based hostile work environment.

### 3. Municipality's Liability

The Supreme Court has held that an employer's liability for harassment may depend on the status of the harasser. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Id.* In contrast, where the "harasser is a 'supervisor,'" the employer is strictly liable "[i]f the supervisor's harassment culminates in a tangible employment action." *Id.* But if the supervisor does not inflict a tangible employment action, "the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* An employee is a "supervisor" "only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in

benefits.'" *Id.* at 2443 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). These rules apply to both sex- and retaliation-based harassment. *See Noviello*, 398 F.3d at 94 ("In importing the hostile work environment doctrine into the anti-retaliation context, courts are left to draw the standards for employer liability from the case law involving hostile work environments in the anti-discrimination context.").

With respect to its liability, the Municipality only argues that it should not be held liable for any harassment by Figueroa-Nieves, whom Maldonado alleges was the sender of the harassing Facebook messages. Defs.' Mot. Summ J. 19. But this argument ignores the other incidents of harassment discussed above, which include an alleged antagonistic statement by Rodríguez-Veléz, the EMO supervisor, and unequal treatment sanctioned by the Municipality's management. Because the Municipality has not argued that it should be absolved from liability resulting from the cumulative effect of all the incidents that form Maldonado's sex-based hostile work environment claim, summary judgment is denied on this claim.

### B.     Retaliation-Based Hostile Work Environment

Having determined that a reasonable jury could find that Maldonado suffered a sex-based hostile work environment, I proceed to review whether a jury could also find in her favor for the retaliation-based hostile work environment she alleges. The First Circuit has held that "the creation and perpetuation of a hostile work environment can comprise a retaliatory adverse employment action." *Noviello*, 398 F.3d at 93. In retaliation-based hostile work environment claims, courts "only consider 'those actions, directed at a complainant, that stem from a retaliatory animus.'" *Roman v. Potter*, 604 F.3d 34, 42 (1st Cir. 2010) (quoting *Noviello*, 398 F.3d at 93). The Supreme Court recently explained that unlike status-based discrimination (i.e., discrimination based on race, color, sex, religion, or national origin), which requires that discrimination be "motivated" by the employee's status, a retaliation-based claim requires that the prohibited criterion (i.e., having opposed, complained of, or sought remedies for workplace discrimination) be the but-for

cause of the prohibited conduct. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522–23 (2013); *see also* 42 U.S.C. § 2000e-2(m).

Accordingly, several of the incidents that were discussed within the context of Maldonado's sex-based discrimination claim cannot be considered for her retaliation-based hostile work environment claim. For example, because the comments by Figueroa-Nieves and Serrano were made prior to Maldonado's participation in the sexual harassment investigation against Bristol in October 2010, they cannot be factored into this analysis. *See Quiles-Quiles*, 439 F.3d at 8 ("The relevant conduct [for a retaliation claim] is that which occurred *after*" the employee engaged in protected conduct). For the same reason, Bristol's comment about flirting with Maldonado cannot be considered within this context.

Yet, there is still sufficient evidence from which a reasonable jury could conclude that Maldonado's participation in the investigation against Bristol was the but-for-cause of the ensuing harassment. As in *Noviello*, where coworkers called the employee a "rat" after she complained about a popular supervisor, the November 1 message threatened Maldonado, insulted her and her family, and specifically referenced her participation in the investigation against Bristol. *See Noviello*, 398 F.3d at 86 ("When harassment follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation" and is "circumstantial evidence of causation").

In addition, when Maldonado returned from unpaid leave in April 2012, there is a genuine dispute of fact as to whether the EMO supervisor, Rodríguez-Veléz, either expressly told her or implied that she would be required to perform janitorial duties rather than her EMT duties. *See Jensen*, 435 F.3d at 450 ("In determining whether conduct was retaliatory cases have tended to focus on [temporal proximity] and the "existence of antagonism in the intervening period"); *see also Del Pilar Salgado v. Abbot Labs.*, 520 F. Supp. 2d 279, 292 (D.P.R. 2007) (courts consider contemporaneous comments made by the employer's decision makers when determining whether causation exists). Though it is undisputed that Maldonado did not ultimately perform janitorial duties, a reasonable jury could infer retaliatory animus from Rodríguez-Velez's alleged statement and the subsequent decision by the Municipality's

management to not allow her to work as an EMT. DSUF ¶ 237; OSMF ¶ 34. There is admittedly overlap between the evidence considered for Maldonado's sex- and retaliation-based hostile work environment claims. The First Circuit has recognized that such overlap is permissible. *Peréz-Cordero*, 665 F.3d at 32. And in such situations, the Third Circuit has reasoned that "when a woman who complains about sexual harassment is thereafter subjected to harassment based on that complaint, a claim that the harassment constituted sex discrimination [as opposed to retaliation-based discrimination] will almost always present a question that must be presented to the trier of fact." *Jensen*, 435 F.3d at 454. Because a reasonable jury could find that the most serious incidents of harassment—the threatening Facebook message and the Municipality's refusal to allow Maldonado to work as an EMT—resulted in severe and pervasive harassment that stemmed from a retaliatory animus, summary judgment on her retaliation-based hostile work environment claim is also denied.

## III.   Retaliation

Title VII makes it unlawful for "an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made unlawful under [Title VII] or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The Supreme Court has explained that this "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N.*, 548 U.S. at 67. Plaintiff establishes a prima facie retaliation case by showing that (1) he undertook protected conduct; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected conduct and the materially adverse action. *Gu v. Bos. Police Dep't*, 312 F.3d 254, 262 (1st Cir. 2004). That showing made, the burden shifts to the employer to articulate a legitimate, nonretaliatory explanation for its actions. *Douglas v. J.C. Penney Co.*, 474 F.3d 10, 14 (1st Cir. 2007). If the employer carries this burden of production, then the

burden returns to plaintiff to show the defendant's reason is a pretext for unlawful retaliation. *Id.*

Maldonado argues without dispute from the Municipality that she engaged in protected conduct by reporting sexual harassment and participating in the investigation against Bristol in October 2010. Pl.'s Opp'n 20; *see Peréz-Cordero*, 656 F.3d at 31 (employee engaged in protected conduct when he complained to his superiors about harassment prohibited by Title VII). Surprisingly, Maldonado does not allege that her filing of the EEOC charge led to retaliation, and so I do not consider whether she suffered retaliation as a result of engaging in that protected conduct. The questions remaining are thus whether she suffered a materially adverse action and whether a causal link exists between that action and protected conduct.

### A.        Materially Adverse Action

A materially adverse action under the "antiretaliation provision, unlike the substantive provision of [Title VII], is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N.*, 548 U.S. at 64; *see also Billings*, 515 F.3d at 54 ("[C]onduct need not relate to the terms or conditions of employment to give rise to a retaliation claim.").[16] Rather, a plaintiff may satisfy this requirement by showing that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N.*, 548 U.S. at 64. "This is an objective test and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 472 (1st Cir. 2010) (quoting *Burlington N.*, 548 U.S. at 71). Under this inquiry, "context matters." *Burlington N.*, 548 U.S. at 69. Examples of adverse

---

[16] Maldonado cites abrogated circuit cases requiring an "ultimate employment decision" to show a materially adverse action. Pl.'s Opp'n 21. The Supreme Court rejected this standard because it was too narrow in *Burlington Northern*. 548 U.S. at 67.

employment actions in the retaliation context "include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)).

Maldonado alleges various materially adverse actions. She first alleges the Municipality failed to investigate her complaint concerning the Facebook messages. Courts have held that an employer's "failure to investigate a complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the complaint was filed" and does not result in a materially adverse action. *Daniels v. United Parcel Serv.*, 701 F.3d 620, 640 (10th Cir. 2012); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 71, 721–22 (2d Cir. 2010). These courts have reasoned that "adopting a contrary rule and finding a failure to investigate establishes a prima facie case of retaliation would open employers to retaliation claims even where they failed to investigate because of a good faith belief the complaint was meritless." *Daniels*, 701 F.3d at 640; *Fincher*, 604 F.3d at 721–22. The Municipality's alleged failure to investigate did not result in subsequent harm to Maldonado or leave her worse off than before she filed the complaint because (1) the police investigated her police report, (2) she was on unpaid leave when she filed the complaint and away from her alleged harassers, and (3) she admitted that her relationship with Figueroa-Nieves was cordial when she returned from unpaid leave.

Second, she alleges the Municipality "forced" her to return from unpaid leave. But her argument is unsupported by the record evidence. In early April 2012, Maldonado went to Figueroa's office to inform her that she was returning to work while continuing medical treatment, as determined by the State Insurance Fund. DSUF ¶ 233.

Third, Maldonado contends the Municipality's mayor did not approve her request for additional unpaid leave, resulting in her termination from the EMO. A termination is a

materially adverse employment action. *Morales-Vallellanes*, 605 F.3d at 36. Because Maldonado was effectively terminated on November 23, 2013, she can show a materially adverse action.

### B.       Causal Link

To determine whether causation exists, courts consider the temporal proximity between the protected activity and the adverse action, the sequence of events, any departures from normal procedure, and contemporaneous statements by the employer's decision makers. *Del Pilar Salgado*, 520 F. Supp. 2d at 292. To be sure, the prima facie burden is "not onerous." *Douglas*, 474 F.3d at 14.

Absent other evidence of causation, Maldonado is unable to establish a causal link between her termination in 2013 and her participation in the investigation against Bristol in 2010, which is the only protected conduct she alleges formed the basis for retaliation, because the three-year time period leads to the inference that the termination was not retaliatory. *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991) ("long period of delay between [protected conduct] and ultimate discharge negates inference of retaliation") (citing *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110–11 (1st Cir. 1988)); *see also Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998) (three-year delay negated inference of retaliation). Thus, Maldonado is unable to establish a prima facie case of retaliation.

### C.       Legitimate, Nonretaliatory Reason and Pretext

Even if Maldonado had established a prima facie case of a retaliatory termination, the Municipality argues that it terminated her because she had exhausted her unpaid leave time and that it had reserved her job for the maximum time period required under state law. DSUF ¶¶ 290–91. Once the employer has come forward with a legitimate, nonretaliatory reason for its action, the burden returns to the plaintiff to show the employer's proffered nonretaliatory reason is a pretext for retaliation. *Douglas*, 474 F.3d at 14. Maldonado argues the Municipality's proffered reason is pretextual because of "the

sudden absences of those that participated as witnesses in the sexual harassment" investigation, and because of "the obvious attempts by the Municipality to manufacture a reason to terminate [her]." Pl.'s Opp'n 23. However, Maldonado admitted that she lacked personal knowledge as to the circumstances that led each of the persons who participated in the investigation to leave the EMO, making her argument speculative and unsupported by record evidence.[17] DSUF ¶ 116. *See Feliciano de La Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 9 (1st Cir. 2000) (summary judgment granted where there was no record evidence to support employee's argument that the employer's proffered nonretaliatory reasons were pretextual). Similarly, her claim that the Municipality's "goal" was always to terminate her amounts to nothing more than a conclusory allegation. Thus, summary judgment is granted on her retaliation claim.

## IV.   Supplemental Claims

Maldonado also alleges various state law claims. *See* Puerto Rico Law 100, P.R. Laws Ann. tit. 29, § 146 *et seq.*; Puerto Rico Law 69, *id.* § 1321 *et seq.*; Puerto Rico Law 17, *id.* § 155 *et seq.*; Puerto Rico Law 115, *id.* § 194(a) *et seq.*; P.R. Bill of Rights; P.R. Const. art. II, § 1; P.R. Civ. Code art. 1802, P.R. Laws Ann. tit. 31, § 5141; P.R. Civ. Code art. 1803, P.R. Laws Ann. tit. 31, § 5142.

### A.   Law 115

Law 115 provides a cause of action when an employer retaliates against an employee for engaging in protected conduct. P.R. Laws Ann. tit. 29, § 194(a) *et seq*. This court has held that a Law 115 retaliation claim is coterminous with a Title VII retaliation claim. *Godoy v. Maplehurst Bakeries, Inc.*, 747 F. Supp. 2d 298, 318 (D.P.R. 2010). Because I granted summary judgment on Maldonado's Title VII retaliation claim, I also grant summary judgment on her Law 115 claim.

---

[17] The Municipality explained that several employees left the EMO because they were term employees whose contract terms had expired. DSUF ¶¶ 114–16. Another employee who participated in the sexual harassment investigation transferred to another office within the Municipality before she participated in the investigation against Bristol. DSUF ¶ 112.

### B.    Remaining State Law Claims

As Maldonado points out, the Municipality's motion does not address the merits of her state law claims. Pl.'s Opp'n 2 n.1. The Municipality argues only that Ortiz-Chevres, Figueroa, Figueroa-Nieves, and Rodríguez-Veléz cannot be held liable for Maldonado's Title VII claims. The First Circuit has held that there is no individual employee liability under Title VII. *Fantini v. Salem State Coll.*, 557 F.3d 22, 30 (1st Cir. 2009). Accordingly, the Title VII hostile work environment claims against Ortiz-Chevres, Figueroa, Figueroa-Nieves, and Rodríguez-Veléz are dismissed.

However, under Puerto Rico Law 17, Law 69, and Law 100, there is individual employee liability for workplace sexual harassment. *Miro Martinez v. Blanco Velez Stores, Inc.*, 393 F. Supp. 2d 108, 117 (D.P.R. 2005) (court dismissed Title VII sexual harassment claims against individual employees, but exercised supplemental jurisdiction over state law claims against employer and individual employees). Law 100, Law 17, and Law 69 each prohibit a sex-based hostile work environment. *Figueroa Garcia v. Lilly del Caribe, Inc.*, 490 F. Supp. 2d 193, 212 (D.P.R. 2007). Because these state law claims and Maldonado's Title VII hostile work environment claim arise from a common nucleus of operative facts, I will exercise supplemental jurisdiction over them. *See id.*; 28 U.S.C. § 1367(a). Thus summary judgment is denied on these state law claims against all defendants.

Moreover, the Municipality has not informed the court of the grounds for dismissing Maldonado's state law claims that she argues arise from the Puerto Rico Bill of Rights, the Puerto Rico Constitution, and Civil Code Articles 1802 and 1803. *See Leyva v. On The Beach, Inc.*, 171 F.3d 717, 721 (1st Cir. 1999) (trial court exceeded the scope of the motion pending before it when it granted summary judgment on all of plaintiffs' "remaining claims" where the defendants' motion for summary judgment only addressed some of their claims). Thus, these claims are not dismissed.

Maldonado-Cátala v. Municipality of Naranjito, et al., Civil No. 13-1561 (BJM)                    29

## CONCLUSION

For the foregoing reasons, the Municipality's motion is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is **GRANTED** on Maldonado's Title VII and Law 115 retaliation claims against all defendants. Summary judgment on Maldonado's Title VII hostile work environment claims are **DENIED** as to the Municipality, but **GRANTED** as to Orlando Ortiz-Chevres, Marialis Figueroa-Negrón, José Figueroa-Nieves, Hiram Bristol-Colon, and José Tomás Rodríguez-Veléz. Summary judgment is **DENIED** on Maldonado's remaining state law claims, which include those that arise from Law 17, Law 69, Law 100, the Puerto Rico Bill of Rights, the Puerto Rico Constitution, and Civil Code Articles 1802 and 1803.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 26th day of October 2015.

*S/ Bruce J. McGiverin*

BRUCE J. McGIVERIN
United States Magistrate Judge